UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
YANAHIT PADILLA TORRES, ARLET MACARENO,
WENDY GARCIA, LINA CARRION, SILVIA
SORIANO, MARIA IRMA HENRIQUEZ, ELENA JIMENEZ,
GRACIELA SIMBANA, OUMOU SYLLA, SOLEDAD JULIA
HILARES HUARCA DE RUIZ, BHISHMA YOGI, PEMA
SHERPA, XIAO FAN LI and the VIOLENCE INTERVENTION
PROGRAM,

                Plaintiffs,                        13 CV 00076 (MKB) (RER)

    -against-

                                          <u>PROPOSED THIRD</u>
                             <u>AMENDED COMPLAINT AND</u>
                               <u>DEMAND FOR JURY TRIAL</u>

THE CITY OF NEW YORK, MAYOR MICHAEL
BLOOMBERG, RAYMOND W. KELLY, COMMISSIONER
OF THE NEW YORK CITY POLICE DEPARTMENT,
in his individual and official capacities, NEW YORK
CITY POLICE OFFICER VINCENZO TRADOLSE, in
his individual capacity; NEW YORK CITY POLICE
OFFICER CHRISTOPHER FURDA, in his individual
capacity, OFFICER SWEETING, in his individual capacity,
NEW YORK CITY POLICE OFFICERS
JOHN/JANE DOES #1 THROUGH #24 in their
individual capacities,

                        Defendants.

--------------------------------------------------------------------x

       Plaintiffs YANAHIT PADILLA TORRES, ARLET MACARENO, WENDY GARCIA,

LINA CARRION, SILVIA SORIANO, MARIA IRMA HENRIQUEZ, ELENA JIMENEZ,

GRACIELA SIMBANA, OUMOU SYLLA, SOLEDAD JULIA HILARES HUARCA DE

RUIZ, BHISHMA YOGI, PEMA SHERPA, XIAO FAN LI and the VIOLENCE

INTERVENTION PROGRAM, respectfully allege as follows:

1

## PRELIMINARY STATEMENT

1.      This civil rights action, brought on behalf of thirteen limited English proficient ("LEP") New Yorkers and the Violence Intervention Program ("VIP"), an organization that serves LEP domestic violence victims, challenges the New York City Police Department's ("NYPD") discriminatory practice of denying interpreters to LEP individuals, which deprives them of access to NYPD services.  This practice is in stark contrast to the NYPD's stated policy that requires NYPD officers and other employees "to provide free language assistance" to LEP individuals.

2.      More than four and a half years after Mayor Michael Bloomberg issued New York City's Executive Order 120 ("EO 120"), which requires city agencies to provide interpretation services to LEP individuals; nearly four years after the NYPD first  implemented its NYPD Language Access Plan ("LAP Plan"); and more than two years after a November 2010 United States Department of Justice compliance review found the NYPD "not fully in compliance" with the requirements of federal law, including Title VI and the Safe Streets Act, regarding their provision of language services to LEP New Yorkers, the NYPD continues to discriminate against LEP crime victims, victims of domestic violence and others who have difficulty communicating in English.

3.      The NYPD's denial of interpreter services has deprived Plaintiffs of their right to report crimes, to protect themselves from dangerous abusers, and to communicate effectively with the police in a wide range of circumstances.

4.      Not only does the NYPD fail to provide language assistance, it also degrades, ridicules and otherwise mistreats LEP individuals who request interpreter services, actively demeaning them for their lack of English proficiency.  In some instances, LEP victims of

domestic violence are arrested because the NYPD relies solely on the reports of their English proficient abusers.

5.        Defendants Mayor Michael R. Bloomberg and Police Commissioner Raymond W. Kelly are responsible for overseeing and executing the NYPD's policies.  By failing to adequately intervene or perform their professional duties, Defendants Mayor Michael R. Bloomberg, Police Commissioner Raymond W. Kelly, the City of New York, Police Officer Vincenzo Tradolse, Police Officer Christopher Furda, Police Officer Sweeting and Police Officers John/Jane Does #1-24, are responsible for harm caused to LEP individuals, including the Plaintiffs, in violation of Title VI of the Civil Rights Act of 1964, the Safe Streets Act, the Equal Protection Clause and the First and Fourth Amendments of the U.S. Constitution, the New York City Human Rights Law, and the Constitution and laws of the State of New York.

## PARTIES

### Plaintiffs

6.        Plaintiff YANAHIT PADILLA TORRES is a resident of Brooklyn, New York.

7.        Plaintiff ARLET MACARENO is a resident of Staten Island, New York.

8.        Plaintiff WENDY GARCIA is a resident of Queens, New York.

9.        Plaintiff LINA CARRION is a resident of Brooklyn, New York.

10.       Plaintiff SILVIA SORIANO is a resident of Staten Island, New York.

11.       Plaintiff MARIA IRMA HENRIQUEZ is a resident of Bronx, New York.

12.       Plaintiff ELENA JIMENEZ is a resident of Bronx, New York.

13.       Plaintiff GRACIELA SIMBANA is a resident of Staten Island, New York.

3

14.        Plaintiff OUMOU SYLLA is a resident of Bronx, New York.

15.        Plaintiff SOLEDAD JULIA HILARES HUARCA DE RUIZ is a resident of Staten Island, New York.

16.        Plaintiff BHISHMA YOGI is a resident of Queens, New York.

17.        Plaintiff PEMA SHERPA is a resident of Queens, New York.

18.        Plaintiff XIAO FAN LI is a resident of Brooklyn, New York.

19.        Plaintiff VIOLENCE INTERVENTION PROGRAM ("VIP") is a nationally recognized Latina organization dedicated to ending violence in the lives of women.  VIP delivers a full range of culturally competent services that enable women to become free of violence and achieve their full potential.  VIP has its main offices in New York, New York.

**Defendants**

20.        Defendant THE CITY OF NEW YORK is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  It is authorized under the laws of the State of New York to maintain a Police Department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.

21.        Defendant MAYOR MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York with supervisory authority over all City agencies, including the NYPD.  He is sued in his official capacity.

22.        Defendant RAYMOND W. KELLY is and was, at all times relevant herein, the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, a municipal agency of the City.  Mr. Kelly is and was responsible for hiring, screening, training, recruiting and managing all NYPD officers, including the Defendants named herein.  He is also responsible for the policies, practices and customs of the

4

NYPD.  He is sued in his official capacity.  The NYPD has its principal offices at One Police

Plaza, New York, 10038.

23.     Defendants VINCENZO TRADOLSE, CHRISTOPHER FURDA, OFFICER

SWEETING and JOHN/JANE DOES #1-24 (the "Individual Officer Defendants"), are, and/or

were, at all times relevant herein, officers, employees and agents of the NYPD.  They are sued in

their  individual capacities.

24.     Mayor Bloomberg, Commissioner Kelly, and the Individual Officer

Defendants have acted under color of state law in the course and scope of their duties as agents,

employees and officers of the City and/or the NYPD in engaging in the conduct described

herein.  At all times relevant herein, Defendants have acted for and on behalf of the City and/or

the NYPD with the power and authority vested in them as officers, agents and employees of the

City and/or the NYPD.

## JURISDICTION

25.     This court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§

1331 and 1343(a), as this action seeks redress for the violation of Plaintiffs' constitutional and

civil rights.

26.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28

U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

27.     Plaintiffs further invoke this court's supplemental jurisdiction, pursuant to 28

U.S.C. § 1367(a), over any and all related state law claims.

28.     This court has personal jurisdiction over all defendants as they are domiciled

in New York, among other bases of personal jurisdiction.

## VENUE

29.        Venue is proper in this Court pursuant to 28 U.S.C.§ 1391.

## JURY DEMAND

30.        Plaintiffs demand trial by jury in this action on each and every one of their

claims.

## STATUTORY AND REGULATORY SCHEME

31.        Title VI of the Civil Rights Act of 1964 states: "No person in the United

States shall, on the ground of race, color, or national origin, be excluded from participation in, be

denied benefits of, or be subjected to discrimination under any program or activity receiving

federal financial assistance."  Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000(d).   The

denial of meaningful access to services for LEP individuals is considered national origin

discrimination under Title VI.

32.        The Safe Streets Act, 42 U.S.C. § 3789d *et seq*., and its implementing

regulations, codified at 28 C.F.R. § 42.201 *et seq*., prohibit discrimination, *inter alia*, on the

basis of national origin by programs funded in whole or in part from funds made available under

42 U.S.C. Chapter 46. 42 U.S.C. § 3789d(c)(4).

33.        The Equal Protection Clause of the Fourteenth Amendment to the U.S.

Constitution guarantees equal rights and equal protection under the laws.  Violations may be

remedied pursuant to 42 U.S.C. § 1983.

34.        The Equal Protection Clause of the New York State Constitution similarly

protects individuals from discrimination by the state or by any person acting under color of state

law.  N.Y. Const., Art.1 § 11.

6

35.     The Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures and the unreasonable use of excessive force by individuals acting under color of state law.  Violations may be remedied pursuant to 42 U.S.C. § 1983.

36.     The First Amendment to the U.S. Constitution guarantees individuals the right to petition the Government for a redress of grievances.  Violations may be remedied pursuant to 42 U.S.C. § 1983.

37.     Article I, §9 of the New York State Constitution affords individuals the right to petition the Government for a redress of grievances.

38.     The New York City Human Rights Law ("NYCHRL"), enacted in 1991, prohibits discrimination based on national origin in public accommodations.  NYC Code § 8-107.  The Law was extensively amended and strengthened in 2005 by the passage of the Local Civil Rights Restoration Act, Local Law No. 85 of 2005.

39.     The NYCHRL provides:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the . . . national origin . . .of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, or, directly or indirectly, to make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place or provider shall be refused, withheld from or denied to any person on account of  . . national origin . . . .

NYC Code§ 8-107(4)(a).

40.     Section 8-401 of the NYCHRL includes the following statement:

> [t]he council finds . . .that the social and moral consequences of systemic discrimination are . . .injurious to the city in that systemic discrimination polarizes the city's communities, demoralizes its inhabitants and creates disrespect for the law,

7

thereby frustrating the city's efforts to foster mutual respect and tolerance among its inhabitants and to promote a safe and secure environment.

41.    NYCHRL § 8-130 provides that:

The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed.

42.    New York State common law protects individuals from false arrest and false imprisonment.

## STATEMENT OF FACTS

### NYPD's Language Access Policy and Practice

43.    Nearly 25 percent of New York City residents over the age of five are limited English proficient (LEP), and require language assistance in order to access the services of the NYPD; 1.2 million of them are Spanish-speaking individuals.  LEP New Yorkers are disproportionately foreign-born; among New York City residents over the age of five, approximately fifty percent of foreign-born residents are LEP, in contrast to only 6.5 percent of U.S.-born residents.

44.    On July 22, 2008, Mayor Bloomberg issued Executive Order 120 ("EO 120"), "Citywide Policy on Language Access to Ensure the Effective Delivery of City Services," which requires each City agency that provides direct public services, including the NYPD, to "ensure meaningful access to such services by taking reasonable steps to develop and implement agency-specific language assistance plans regarding LEP persons."  The Order further requires that each city agency designate a Language Access Coordinator, develop an appropriate language access

8

policy and implementation plan, and provide language services based on at least the top six languages spoken by the population of the City.

45.     In April 2009, the NYPD published its Language Access Plan (the "Plan"). The Plan requires NYPD officers responding to LEP individuals to provide interpretation services as necessary either via the Operations Unit, using NYPD employees to interpret, or through the use of a contracted interpreter via Language Line (a telephonic interpreting company).  The Plan states that NYPD's policy is to "take reasonable steps to provide timely and meaningful access for LEP persons to the services and benefits that the Department provides to the degree practicable."  The Plan further requires that "[w]hen performing law enforcement functions, members provide free language assistance to LEP individuals whom they encounter when necessary or whenever an LEP person requests language assistance services."

46.     The United States Department of Justice ("DOJ") subsequently reviewed the Plan as implemented by the NYPD and found that the NYPD failed to comply with federal law, including Title VI of the Civil Rights Act of 1964 and the Safe Streets Act.  The DOJ's compliance review consisted of an in-depth administrative analysis of the NYPD's policies and procedures with respect to LEP individuals.  On November 8, 2010, the DOJ issued a 43-page report, addressed to Defendant Raymond Kelly, outlining various problem areas and shortcomings in the Plan and its implementation (the "Compliance Review").  On June 14, 2012, the NYPD released a revised Plan (the "Revised Plan").

47.     In January and February of 2012, Plaintiff's counsel contacted the NYPD's legal department, by telephone and in writing, to discuss the language barriers faced by LEP clients, specifically as they relate to domestic violence victims. The NYPD declined to meet with counsel.

9

48.      On March 28, 2012, Plaintiff's counsel received a written response from the NYPD outlining a new program to allow police officers to access telephonic interpreters from any available telephone at any time of day.  According to the letter, this program was initiated as a pilot program in Patrol Borough Queens South in July of 2011 and rolled out citywide in February 2012.

49.      As set forth below, despite its adoption of language access policies, and despite being notified by the DOJ of deficiencies in its policies and practices, the NYPD has continued to routinely deny LEP individuals access to police protection and to the broader legal system.  Indeed, NYPD personnel not only fail to provide language services, but on many occasions actively mock and humiliate LEP individuals who request such services, and retaliate against them for making such requests.

50.      Victims of domestic violence and other crimes, such as the Plaintiffs and clients of Plaintiff Violence Intervention Program, are particularly vulnerable to NYPD's unlawful practices, which leave them unable to communicate with police in emergency situations, to get the protection they need, to file police reports, and to obtain medical assistance.

51.      Moreover, as the experiences of the Plaintiffs illustrate, NYPD's failure to provide language assistance to LEP domestic violence complainants frequently results in their wrongful arrest or with threats to arrest them, rather than the arrest of their abusers.


**Plaintiff Yanahit Padilla Torres**

52.      Yanahit Padilla Torres is a twenty-six year old Spanish-speaking woman from Mexico.

53.      Ms. Padilla Torres speaks very limited English.  She can understand some

10

words but has difficulty with even the most basic phrases.

54.     Ms. Padilla Torres lives in Brooklyn with her four year-old son Anthony.

55.     From 2007 until 2011, Ms. Padilla Torres lived with her boyfriend, Anthony Rovira, who was physically and verbally abusive to her.  Anthony set up video cameras in their apartment to monitor her activities.

56.     On November 15, 2011, Mr. Rovira grabbed Ms. Padilla Torres by the feet and pulled her off the bed and began beating her.  Ms. Padilla Torres pleaded with him to stop but he did not.  She screamed for help and her son came into the room.  Mr. Rovira stopped hitting her and left the room.

57.     Ms. Padilla Torres then called 911.  She asked for someone who spoke Spanish and a Spanish-speaking operator came on the phone.  Ms. Padilla Torres told the operator that her boyfriend was beating her.  She asked if they would send an officer who spoke Spanish.

58.     Two police officers arrived shortly afterwards, including Officer Christopher Furda.

59.     When the officers arrived, they approached Mr. Rovira, who is proficient in English, and began to speak with him. They did not speak with Ms. Padilla Torres even though she had called 911.  Ms. Padilla Torres approached the officers while they were speaking with Mr. Rovira and tried to explain what had happened in Spanish.  Officer Furda said something to the effect of, "we don't speak Spanish."

60.     The officers continued to speak with Mr. Rovira, ignoring Ms. Padilla Torres, who continued to ask for help in Spanish.

61.     Ms. Padilla Torres saw Mr. Rovira and the two officers smoking cigarettes

11

together and talking and felt she was not going to get any help.  At this point, she called 911 again and asked them to send a Spanish-speaking officer to the scene. Ms. Padilla Torres told the operator that her boyfriend had beaten her and that she could not communicate with the officers who responded.  The operator told her she would send a Spanish-speaking officer.

62.     In a little while, another patrol car arrived with an officer who spoke Spanish. Ms. Padilla Torres showed him the bruises on her arm and told him, in Spanish, that Mr. Rovira had hit her.

63.     The Spanish-speaking officer said that Mr. Rovira also had marks on him, and that if she wanted to make a police report they would both be arrested and a judge would ultimately decide what happened.  Ms. Padilla Torres indicated that she still wanted to make the report.

64.     Officer Furda spoke with this officer, and then the Spanish-speaking officer told Ms. Padilla Torres that he needed to leave but that the other officers would take her report.

65.     Ms. Padilla Torres' cousin, Janette Hernandez, arrived at this time.  Ms. Padilla Torres had called her and asked her to come to watch her son.

66.     Ms. Padilla Torres tried to ask the officers for their names and identification numbers in English, but they ignored her and refused to speak to her.  They continued to speak only to Mr. Rovira.

67.     Ms. Padilla Torres called 911 for a third time, this time asking for a police officer with a higher rank because the officers who responded were not assisting her.

68.     Officer Furda told Ms. Hernandez in English that Ms. Padilla Torres should make a report stating that Mr. Rovira had not hit her because it would be easier.  Ms. Hernandez responded that Ms. Padilla Torres would never do that since Mr. Rovira had beaten her.

69.      A third patrol car then arrived.  Officer Furda called Ms. Padilla Torres over to him, put her in handcuffs and put her in the patrol car.  She saw that Mr. Rovira was also put in a patrol car but without handcuffs.

70.      Shortly thereafter, around 3 a.m., Ms. Padilla Torres arrived at the 72nd precinct in Brooklyn.  She was taken to a cell.  She was given a piece of paper but could not understand what was written on it.

71.      Since the officers had not explained what was happening, Ms. Padilla Torres was scared, worried about her son, and afraid that she was being incarcerated for a long time.

72.      Ms. Padilla Torres spent the night in the cell. In the morning, around 8:00 a.m., she was taken to another location where she was photographed.  While a woman was patting her down, she touched Ms. Padilla Torres' arm where she had a bruise from the beating. It was very painful for Ms. Padilla Torres and the woman looked at the bruise and suggested she be taken to a hospital for treatment.  This woman took Ms. Padilla Torres over to a Spanish-speaking employee.

73.      This employee examined the bruises and called over a supervisor who looked at the bruises and said something to the effect of, "this is domestic violence."  Ms. Padilla Torres was then taken in an ambulance to Methodist Hospital by Officer Furda.

74.      Officer Furda handcuffed Ms. Padilla Torres to the bed in the hospital, and remained with her the whole time she was in the hospital, even accompanying her to the bathroom.  After she received treatment for her injuries, Officer Furda brought her back to the precinct.  When they arrived at the precinct at approximately 6:00 p.m., she was allowed to go home.  Ms. Padilla Torres was not provided with any explanation of why she had been arrested and was not told whether there were charges against her.

13

75.     Mr. Rovira obtained an order of protection against Ms. Padilla Torres in Family Court based on her arrest on November 15th.  As a result of the protective order against her, Ms. Padilla Torres spent one month and nine days separated from her three year-old son.

76.     Mr. Rovira has approached Ms. Padilla Torres on many separate occasions since she obtained an Order of Protection against him on November 21, 2011.

77.     Because of the treatment she suffered on the night of November 15th, Ms. Padilla Torres is fearful of calling the police in the future.  She does not have confidence that the police would help her and is fearful that they would arrest her again.

78.     Within ninety days after the claims alleged by Ms. Padilla Torres arose, a written notice of claim, sworn to by the claimant, was served upon the defendants by personal delivery of the notice, in duplicate, to the Comptroller's Officer at 1 Centre Street, New York, New York.

79.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

80.     This action was commenced within one year and ninety days after the happening of the events upon which the claims are based.


**Plaintiff Arlet Macareno**

81.     Arlet Macareno is a twenty-six year old woman from Mexico.  Ms. Macareno's primary language is Spanish, and her ability to speak and understand English is very limited.

82.     Ms. Macareno lives on Staten Island with her seven year-old son.

83.     Until recently, Ms. Macareno lived with her husband, Martin Cruz, in an apartment on the second floor of a house owned by her brother-in-law.  The downstairs apartment was inhabited by various relatives of Mr. Cruz, including his twenty-two year-old niece, Angela Guzman.

84.     Ms. Macareno's husband has a history of violence, and as a result, Ms. Macareno has been the victim of domestic violence on several occasions.

85.     One night in early August, 2012, in the presence of their son, Ms. Macareno's husband pushed her down a flight of stairs.  As a result, she was seriously bruised, experienced blurred vision and dizziness.

86.     When her niece, Ms. Angela Guzman, arrived home from work and saw Ms. Macareno lying at the bottom of the stairs, she called 911.

87.     Shortly afterwards, four police officers and an ambulance arrived.  Ms. Macareno tried to explain to the officers what happened using her very limited English, but the officers ignored her, electing instead to speak to her niece, who is proficient in English.

88.     Ms. Macareno tried to get the officers' attention and asked for an interpreter by saying "interprete" (interpreter).  One officer, Vincenzo Tradolse, turned to her and said, in English, words to the effect of, "I don't care, go to sleep."  When Ms. Macareno persisted in trying to explain that her husband had pushed her down the stairs, Officer Tradolse responded in English, telling her to shut up and go to sleep.

89.     The officers continued to ignore Ms. Macareno's repeated requests for an interpreter, instead conducting a conversation with her niece.

90.     Officer Tradolse told Ms. Macareno, "callate la boca" (shut your mouth) and again said he did not care each time she requested an interpreter.  The other officers just stood there watching and laughing.

91.     Officer Tradolse then said to her in sum and substance, "if you don't callate la boca, I will arrest you."  When Ms. Macarena continued to attempt to get Officer Tradolse's attention, he became angrier with her and then arrested Ms. Macareno.

92.     The officers took no action against Ms. Macareno's husband, instead telling him to go upstairs to sleep.

93.     The officers arrested Ms. Macareno, who was barefoot, and did not allow her to retrieve her shoes from her apartment.

94.     Ms. Macareno was in a lot of pain from the fall and was very scared.

95.     There were two officers in the front of the police car, Officer Tradolse and one other. There was another officer in the back next to Ms. Macareno.  Since Officer Tradolse had told her to "callate la boca," Ms. Macareno then asked him, in Spanish, if he spoke Spanish. He answered, "oh si, si hablo espanol. Gol! Gol! Mexico! Vamos Mexico! Chicharito!" This means "oh, yeah, I speak Spanish, Goal! Goal! Mexico! Let's go Mexico! (Chicharito is the name of a Mexican soccer player.)  The two officers in the front began to laugh and speak in English, and Ms. Macareno could not understand what they were saying.

96.     When they arrived at the precinct at around 2 a.m., Officer Tradolse took Ms. Macareno the long way around the car and made her walk through puddles in her bare feet. Inside the precinct, the floor was wet and she slipped.  The officers laughed at her.  Ms. Macareno asked for a lawyer or for someone who spoke Spanish to assist her.

16

97.     Finally, an officer who spoke Spanish came over to her.  Ms. Macareno told him that the other officers were making fun of her. This officer told her that it did not matter and that it would be their word against hers.  Ms. Macareno told him that her husband had pushed her down the stairs and that she did not understand why *she* was arrested.  He told her that she was arrested for her lack of respect for the police.  Ms. Macareno asked him why – was it because she had asked for an interpreter?   The officer then walked away.

98.     Ms. Macareno attempted to tell the officers and employees at the police station that she was in pain from being pushed down the stairs.  However, they failed to provide Ms. Macareno with any medical treatment.   Instead, they put her in a cell where she spent the night.

99.     The next day, Ms. Macareno was taken to criminal court and charged with Obstruction of Government Administration.  Her brother paid for an attorney to represent her, but the lawyer did not speak Spanish or provide her with an interpreter.  Ms. Macareno ultimately pled guilty to disorderly conduct.

100.     After she was released, Ms. Macareno and her cousin Nancy, went to the 120th precinct to file a report regarding the domestic violence incident.  Her cousin, who speaks English very well, filled out the form in English for Ms. Macareno.  Although the officers were aware that Ms. Macareno was a limited English proficient Spanish-speaker, no one at the precinct told her that she could fill out the form in Spanish.

101.     A few days later, a detective called Ms. Macareno's cousin Nancy and informed her that Ms. Macareno would be given an Order of Protection and that she should come to the precinct.  Ms. Macareno went to the precinct, accompanied by her cousin.  A detective came to speak with her but instead of using an interpreter, he just spoke directly to her

17

cousin.  Her cousin did not interpret the conversation but spoke directly with the officer.  Ms. Macareno did not understand what they were saying. Her cousin explained that she needed to go to court to get the Order of Protection.  Ms. Macareno said she felt she had been arrested for asking for an interpreter.  When her cousin told the detective this, the detective said that Ms. Macareno had been charged with obstructing the investigation.

102.     On August 8, 2012, Ms. Macareno obtained a Temporary Order of Protection against her husband, which is still in effect.  A few days later, an officer accompanied Ms. Macareno to her apartment to gather her belongings.  The officer who accompanied her did not speak Spanish and did not use an interpreter to speak with her.  Her cousin accompanied her as well.  While they were at the apartment, her husband's family, her cousin, and the officer had a long argument in English.  Ms. Macareno could not understand most of the conversation. Finally her cousin explained to her that she had a right to stay in the apartment with her son and that her husband had to leave.

103.     As she had nowhere else to go, Ms. Macareno decided to stay in the apartment with her son.  However, the first day she was in the apartment without her husband, he came to the apartment and refused to leave.  Ms. Macareno was scared and left.  While she was gone, he changed the locks and she could not re-enter.

104.     When Ms. Macareno went with her cousin to the precinct to complain that she had been locked out of her home and that her husband had violated her Order of Protection, the same English-speaking detective who had spoken to her the last time she was at the precinct was there and again failed to use an interpreter to communicate with her.  Again, her cousin spoke directly to the detective to explain what happened and Ms. Macareno was not offered any way to communicate with the police herself.

105.     As a result of the arrest and the treatment she received from the police, Ms. Macareno feels traumatized.  Ms. Macareno feels that if something happened to her, she would not call the police or go to a precinct again because she fears the police and does not believe they would protect her.

**Plaintiff Wendy Garcia**

106.     Wendy Garcia is a thirty-three year-old Spanish-speaker from Guatemala. Her English is very limited.

107.     Ms. Garcia lives in Queens with her two sons, ages five and seven.

108.     In August, 2012, Ms. Garcia was in an intimate relationship with Alex Moncada.

109.     On August 20, 2012, in Ms. Garcia's apartment, Mr. Moncada pushed Ms. Garcia and she fell to the floor.  He also slammed a door on her, injuring her elbow and foot.

110.     Because Mr. Moncada had been violent with her before, and she did not want the violence to escalate, Ms. Garcia called 911.  Ms. Garcia requested a Spanish-speaking operator and was able to explain in Spanish what had happened to her.

111.     Shortly afterward, four police officers arrived at Ms. Garcia's building, none of whom spoke Spanish.  When Ms. Garcia requested a Spanish speaker, one of the officers told her that there was nobody who could speak Spanish to her.  The officer said something to the effect of, "No Spanish, only English."  Ms. Garcia then struggled in English to tell the officer that she would not be able to explain what had happened in English.

112.     The police officer then asked her in English, "you ok?" and Ms. Garcia responded that she was not ok.  Her elbow hurt from the fall and being crushed in the door, but

19

she was not sure of the word for elbow in English.

113.    The officer then instructed her to sit in a corner and went over to speak to Mr. Moncada, who speaks English well.

114.    Concerned that she would not be able to tell her side of the story, Ms. Garcia called her brother and requested that he translate for her.

115.    When she tried to hand the phone to the police officer and to explain that her brother would translate, the police officer said, "no, no" and took the phone away.  The officer then threw the phone on the counter.

116.    Frustrated and scared, Ms. Garcia began to cry.  One of the officers asked her something to the effect of, "why are you crying?"  Ms. Garcia again tried to communicate in English that she needed to speak to someone in Spanish. The police officer said something to the effect of, "no, only English."

117.    One of the police officers gave Ms. Garcia a form to fill out with her personal information and room to make a statement.  No one told her she could write in Spanish, but she did write a statement in Spanish.  No one gave her a copy of this form.

118.    After speaking exclusively to Mr. Mocada, the officers wrote a report.  Ms. Garcia then heard the officers say something to Mr. Moncada about arresting her.  Ms. Garcia understood Mr. Moncada when he said that she should not be arrested because of her children.

119.    One of the officers asked Ms. Garcia if she had pushed Mr. Mocada, and she tried to explain what had actually occurred, but was unable to do so due to her limited English. The police officers then completed the report and gave a copy to Mr. Moncada but not to Ms. Garcia.

120.    Ms. Garcia tried unsuccessfully to explain to the officers that she wanted Mr.

Moncada to leave because he did not reside there.  However, the officers never asked Mr. Moncada to leave and never asked Ms. Garcia whether she wanted him to leave.

121.     As the police officers were leaving, the one who had spoken to Ms. Garcia previously again spoke to her in English.  She understood him to say he was not going to arrest her now but they *would* arrest her if she called 911 again.

122.     When the police left, Ms. Garcia felt deceived, frustrated and scared because the police had threatened to arrest her.  She felt that if Mr. Moncada became violent again, she would not call the police.  Instead of staying in her apartment, where Mr. Moncada remained, Ms. Garcia woke up her son and took him to her mother's house in Brooklyn.

123.     On or about August 22, 2012, Ms. Garcia went to the Family Justice Center in Queens and spoke to a counselor from Sanctuary for Families about the events of August 20th. The counselor called the 102nd Precinct for Ms. Garcia and found out that a report had been filed against Ms. Garcia by Mr. Moncada on the night of August 20th alleging that she hit him.

124.     On or about August 23rd, Ms. Garcia went to the 102nd Precinct to get a copy of the report.  When she requested a Spanish interpreter, she was told she would have to wait.

125.     After waiting for ten minutes, she called a counselor from VIP, where she had been seeking services as a domestic violence victim.  Her counselor attempted to call the precinct herself.  The counselor then called the supervisors at Borough Patrol Queens South, and requested an interpreter for Ms. Garcia.

126.     Rather than call a qualified interpreter, Ms. Garcia heard an officer at the precinct ask around the precinct if anyone spoke Spanish.  Ultimately, the officer found someone with limited Spanish who assisted Ms. Garcia.  Ms. Garcia said she wanted a copy of the police report but was told that it was not in the system.

127.     The officers in the precinct gave Ms. Garcia the number of a police officer she could call for further assistance in Spanish but she felt so awful from the whole experience that she left the precinct without seeking further assistance.

128.     Ms. Garcia was frustrated and disheartened that the police repeatedly refused to communicate with her in Spanish when she needed help.  As a result of this incident, Ms. Garcia distrusts the police and feels she cannot call upon them because she fears that she will be arrested if she seeks assistance in the future.

**Plaintiff Lina Carrion**

129.     Lina Carrion is a thirty-nine year old woman who was born in Ecuador.  Her primary language is Spanish and she speaks very limited English.

130.     Ms. Carrion lives in Brooklyn, New York with her ten year-old daughter, Jennifer Pizarro, and Ms. Carrion's two brothers.

131.     On August 12, 2012, Ms. Carrion found out that her boyfriend had been sexually abusing her daughter for a period of approximately three months.  The next day, Ms. Carrion brought Jennifer to Lutheran Hospital to be examined.

132.     Upon arrival at the hospital, Jennifer and Ms. Carrion were interviewed by an English-speaking nurse through an interpreter, and then by a Spanish-speaking social worker.

133.     The social worker told Ms. Carrion that she was going to call the police because of the sexual abuse.  Ms. Carrion asked her to request a Spanish-speaking officer since her English is very limited.

134.     When two English-speaking police officers arrived at the hospital, Ms. Carrion again requested an officer who spoke Spanish.  One of the officers made a phone call,

22

but when two additional officers arrived shortly thereafter, neither spoke any Spanish.

135. Ms. Carrion again stated that she needed someone who could speak to her in Spanish, but was told in sum and substance that an interpreter was not needed because her ten-year-old daughter speaks English.

136. Given the intimate nature of the situation and in light of her desire to understand the officers' communication with her young daughter, Ms. Carrion again requested an officer who spoke Spanish.

137. Despite Ms. Carrion's repeated requests for a Spanish-speaking officer, the officers proceeded to interview Jennifer in English for approximately thirty minutes. Ms. Carrion could not understand what was being said. Despite Ms. Carrion's repeated protests, the interview continued without an interpreter.

138. Ms. Carrion was extremely upset that she could not understand the conversation. She complained to the social worker and asked her if *she* could interpret, but the social worker was very busy and said she could not.

139. After a period of time, two additional officers arrived who did not speak Spanish. They helped finalize the police report and had Ms. Carrion's daughter fill in a portion in English.

140. One of the officers asked Ms. Carrion to sign the report. Despite the fact that she was unable to understand what the report said, Ms. Carrion signed it. Neither she nor her daughter was given a copy of the report.

141. The officers' failure to provide Ms. Carrion with an interpreter or Spanish-speaking officer prevented Ms. Carrion from being able to communicate what she knew about the assaults on her daughter to the police officers, provide support to her young daughter during

a very sensitive time and to understand the steps the police were taking regarding the abuse.

142.     Ms. Carrion felt upset and frustrated, and felt that she was being discriminated against by the police.


**Plaintiff Silvia Soriano**

143.     Sylvia Soriano is a thirty-four year old Spanish speaker from Mexico. Her ability to communicate in and understand English is very limited.

144.     Ms. Soriano lives in Staten Island with her husband, Jose Velez, and three of her four children, aged 2, 5, and 15.

145.     Ms. Soriano moved to Staten Island from the Bronx in December 2011.  Since relocating, her family has received repeated threats and been subjected to multiple acts of violence by other residents of the New York City Housing Authority ("NYCHA") project where they live.  She believes her family is a target of threats because they are Mexican.

146.     Ms. Soriano's 18 year-old son, Jose Franco, relocated to Mexico after being beaten up and threatened for being Mexican by residents in the NYCHA project where they live.

147.     In mid-August, 2012, Ms. Soriano was in a park near her home with her husband and three children, when approximately fifteen teenagers approached a group of children playing and made a circle around them.  The teenagers hit and spat on the children, and one of the teenagers repeatedly threw a basketball at Ms. Soriano's five year-old.  Ms. Soriano called 911, explaining in Spanish what was occurring.

148.     The teenage perpetrators continued to taunt and threaten Ms. Soriano's children.  When she attempted to protect her children, one of the teenagers took out a gun, pointed it at her head, called her a "Fucking Mexican," and instructed her to leave the area.  Her

24

husband also heard one of the perpetrators say words to the effect of "this won't end until you leave." They continued to taunt the Soriano family until Ms. Soriano requested that another person in the park take a photograph of them, at which point they ran away. Before they left, the teenager with the gun told Ms. Soriano's daughter that her mother better "get out of his face" or he would kill them.

149.    When the police did not respond after about fifteen minutes, Ms. Soriano's husband called 911 again to complain that they were in danger and the police had not arrived. The responding officers, who did not speak Spanish or use interpreters to communicate with Ms. Soriano and her husband, arrived after another ten minutes.

150.    Ms. Soriano struggled to tell them that she needed to speak with someone who spoke Spanish. The officer responded to her request saying in sum and substance "this is America, you have to speak English." When Ms. Soriano's daughter attempted to tell the officers what happened, they instructed Ms. Soriano and her family to return to their home.

151.    Then Ms. Soriano became desperate, pointing to the cameras on the building because she thought there would be recordings of the people who had assaulted her family. The officers did not understand what she was trying to communicate and without attempting to understand, began to laugh.

152.    Later that day and in the days that followed, the Sorianos were taunted and threatened by the same teenagers.

153.    When Ms. Soriano went to the NYCHA office to request a transfer to another housing project because of the threats, she was told that she needed to provide NYCHA with a police report.

154.    NYCHA gave Ms. Soriano a crime report form, which she tried to fill out and

mailed to the 120th Precinct.  A few days later, she went to the precinct to check on it.  No one

spoke to her in Spanish and they refused her requests for an interpreter, stating in sum and

substance that no one at the precinct spoke Spanish.

155.    A police officer then offered to speak to Ms. Soriano's daughter in English,

and told her that the computers were not working and that they needed to come back another

day.  He handed her a form and told Ms. Soriano she could fill it out and mail it back.

156.    Ms. Soriano did send the form in but it was sent back to her with instructions

in English saying that she needed a complaint number and could get that number by calling the

precinct.

157.    On October 1, 2012, Ms. Soriano returned to the 120th Precinct with her

attorney.  Her attorney requested an interpreter for Ms. Soriano in order to file a police report.

An officer told her attorney that no one was available who spoke Spanish, and instead asked the

attorney if *she* could interpret for Ms. Soriano.  When her attorney refused, and pointed to the

sign regarding the provision of free interpreter services, the officer sighed and rolled his eyes.

After making Ms. Soriano and her attorney wait for approximately fifteen minutes, he eventually

found a Spanish-speaking officer who took Ms. Soriano's complaint.

158.    On January 5, 2013, a neighbor in Ms. Soriano's apartment building began

banging on the walls and door to Ms. Soriano's apartment.  When Ms. Soriano's husband opened

the door, the man began insulting them in English and saying things to the effect of, "you

fucking Mexicans" and "fucking immigrants" and threatening them with violence.  Ms.

Soriano's fifteen year-old daughter called 911.  After twenty-five minutes when no police

officers had arrived, she called again.  When speaking with the 911 operator, Ms. Soriano's

daughter requested that the police send a Spanish-speaking officer to her home because her

parents do not speak English well.

159.     Approximately five officers arrived at the home and none of them were able to communicate with the Soriano family in Spanish.  Ms. Soriano said to one officer, "yo no hablo Ingles" (I don't speak English).  The officer responded something to the effect of "no Spanish."

160.     Ms. Soriano's fifteen year-old daughter interpreted what the police were saying for her parents.  The police said that there was nothing they could do and that the family should make a complaint with the NYCHA housing office.  The officers did not offer to file a police report for the family.

161.     Because they feared for their safety, on January 7, 2013, Ms. Soriano and her husband returned to the 120th precinct to attempt to file a police report about the ongoing threats from their neighbors.  Ms. Soriano requested assistance in Spanish at the precinct and was told that no one was there who could speak Spanish.

162.     Ms. Soriano's husband attempted to communicate with the officers in the precinct in very basic English.  He tried to explain that the family was receiving ongoing threats and harassment because they are Mexican.  The officers did not take a police report. Ms. Soriano's husband felt he could not explain everything that he wanted to because he was not able to speak to someone in Spanish.

163.     In early 2013, Ms. Soriano called 911 at approximately 2:00 a.m. when she found her daughter's boyfriend in her apartment without her permission.  Ms. Soriano subsequently sought an Order of Protection against him on behalf of her daughter because he is twenty-four years old and her daughter is fifteen.  Additionally, she fears for her daughter's safety with him.

164.     When the police responded to her call, Ms. Soriano could not communicate the situation to them because they did not speak Spanish or offer her an interpreter.  One of the officers asked Ms. Soriano if she spoke English.  When she answered no, the officer said something to the effect of, "then there is nothing we can do."  The police officers began to laugh and left the premises.

165.     The NYPD officers' failure to provide Ms. Soriano and her husband with an interpreter, both at their home and at the 120th precinct, deprived Ms. Soriano of access to police protection.  NYPD's refusal to provide her with assistance from a Spanish-speaking officer or interpreter also prevented her from being able to file reports about various threats against her and her family, and impeded Ms. Soriano's ability to transfer to a safer NYCHA project.

166.     As a result of her inability to file the appropriate reports, Ms. Soriano fears for the lives and safety of her family, feels helpless, and feels she is being discriminated against because of her national origin and because she is unable to speak English.


**Plaintiff Maria Irma Henriquez**

167.     Maria Irma Henriquez is a twenty-six year old woman who was born in El Salvador.

168.     Ms. Henriquez has very limited English and also cannot read in English.

169.     Ms. Henriquez is the survivor of extreme domestic violence at the hands of her former partner and the father of her son, Mr. Juan Guzman-Torres.  Ms. Henriquez lived with Mr. Guzman-Torres from 2007 until late 2009.

170.     Ms. Henriquez and Mr. Guzman-Torres have a child together, Eric Guzman, who was born on February 3, 2008.  Ms. Henriquez also has a child from a previous relationship,

28

Katerin Mejia Henriquez, who was born on January 30, 2003.

171.     After approximately one month of living together, Mr. Guzman-Torres began to abuse Ms. Henriquez on a regular basis.  He would also prohibit her from leaving the house by taking her keys.  Mr. Guzman-Torres was a habitual drinker and would become very violent when inebriated.

172.     Ms. Henriquez suffered regular bruising and bleeding from the beatings.  Mr. Guzman-Torres would often punch her, pull her hair, hold a knife to her, and throw plates of food at the walls. The abuse happened almost on a daily basis.

173.     Ms. Henriquez was also abused throughout her pregnancy with their son.  On many occasions, Mr. Guzman-Torres would beat her while she was pregnant and threaten to kill the unborn fetus. Ms. Henriquez was fearful of leaving him and had no relatives or friends to turn to because Mr. Guzman-Torres would not permit her to be in contact with anyone.

174.     One night in February 2008, when Eric was approximately one month old, Mr. Guzman-Torres violently abused Ms. Henriquez and held a knife to her neck.  When he fell asleep later, she took her baby and climbed down the fire escape.  Freezing and injured from the beating, she called 911.  Mr. Guzman-Torres was arrested.

175.     Ms. Henriquez later allowed Mr. Guzman-Torres to return home because she was desperate.  She had no way of supporting herself and no one else to turn to.  The abuse continued.

176.     During the next four years, Ms. Henriquez estimates that she called the police approximately fifteen times as a result of the violence.   Because of the severity of her head injuries that resulted from the beatings, she has memory problems making it difficult to remember many dates and details.

177.     When Ms. Henriquez would call the police after being abused, Mr. Guzman-Torres would often leave the home.  Sometimes police would respond, but on more than one occasion, no one ever arrived.

178.     Usually Ms. Henriquez would speak in Spanish with the 911 operator, but when the police would arrive, no one would communicate with her in Spanish or offer to get her an interpreter. Because the police rarely were able to communicate with her, she often was not able to file police reports when the police came to her home.  The police would often resort to attempting to communicate with her using hand signals and speaking in English.

179.     Ms. Henriquez was only able to file a Domestic Incident Report on approximately two occasions, July 2, 2008 and July 29, 2008.

180.     On November 30, 2008, the violence had escalated and Ms. Henriquez was living in fear of Mr. Guzman-Torres.  One day she called 911 when Mr. Guzman-Torres was in the home and the police came and arrested him.  Ms. Henriquez does not remember any of the police officers communicating with her in Spanish.  As a result of this arrest, Ms. Henriquez was able to secure her "U" visa, securing her U nonimmigrant status.

181.     When Mr. Guzman-Torres was released, he no longer lived with Ms. Henriquez but would continue to follow her, harass her, meet her at her workplace and violate the Order of Protection she had secured against him.

182.     Sometimes Ms. Henriquez would call 911 when he violated the Order of Protection or abused her.  Sometimes she would call once or twice a week because he would find her and beat her.  The officers who responded to her calls usually did not communicate with her in Spanish and did not allow her to make a Domestic Incident Report.

183.     Ms. Henriquez did not feel that the police understood her and as a result, did

30

not feel that they took the violence seriously.

184.     On September 14, 2011, Ms. Henriquez left the restaurant where she worked at approximately four or five a.m. Mr. Guzman-Torres grabbed her on the street and put her in his car.  He began insulting her, beating her and holding her by the hair with one hand while driving with the other.  He was inebriated and driving very fast.  Ms. Henriquez tried to open the window and tried to scream; she even tried to throw herself out of the car.

185.     Mr. Guzman-Torres continued to beat her in this manner for approximately one and half hours.  Mr. Guzman-Torres threatened to kill her.  Ms. Henriquez lost consciousness for part of the time because of the beating. Ms.  Henriquez thought she would die. Finally, he threw her out of the car into the street with oncoming cars.  As she was thrown out, she grabbed the mirror which fell off of the car.

186.     Ms. Henriquez, who was visibly injured and disheveled, called 911 after wandering about in a daze.  The police arrived but they did not speak Spanish.  They did not offer her an interpreter or otherwise attempt to communicate with her in Spanish to find out what had happened.  They took her to her home and left her with her aunt.  She was not given an opportunity to make a report or asked to make a statement.   The police officers did not ask her who had hurt her.

187.     Ms. Henriquez immediately called her lawyer, Marisol Arriaga, at the Legal Aid Society who had been assisting her with her immigration case.  On September 16, 2011, Ms. Arriaga called the 50th precinct in the Bronx and spoke with DVPO Grogan.  She explained to Officer Grogan that Ms. Henriquez had been severely brutalized and needed to file a report and that she would be coming to precinct shortly.  Ms. Arriaga then prepared a letter to the precinct requesting that they provide Ms. Henriquez with interpretation services in order to file a report

about the violent episode.

188.     Ms. Henriquez went to the precinct with the letter from Ms. Arriaga but even after presenting the letter from Ms. Arriaga to employees at the precinct no one there offered to provide her with an interpreter or take her report.

189.     A Spanish-speaking receptionist looked up her name in the computer system and explained that Mr. Guzman-Torres had made a report against *her* stating that she had broken the mirror on his car.  Ms. Henriquez stated that she had been violently assaulted by him and that she needed an Order of Protection.  The receptionist told her that they could not help her make a report.

190.     Mr. Guzman-Torres was never arrested as a result of this incident and Ms. Henriquez never secured an Order of Protection against him as a result of this incident.  Later that day Mr. Guzman-Torres called her to tell her that *he* had filed a report against *her*.  He also showed up at her apartment with the report and waved it in her face, laughing and saying that she would never be able to make a report against him and threatening her with more violence.  This was extremely traumatizing to Ms. Henriquez.

191.     Ms. Henriquez has extensive injuries as a result of the years of violence that she suffered, including regular migraine headaches, very severe memory problems, almost constant pain, vision problems, and difficulty understanding people who talk to her.

192.     Ms. Henriquez never tried to seek assistance from the police again because she feels they are not on her side and will not assist her.

**Plaintiff Elena Jimenez**

193.     Elena Jimenez is a thirty-four year old Spanish-speaking woman from the

Dominican Republic.

194.     Ms. Jimenez is a monolingual Spanish speaker. She does not speak English but she can understand some English.

195.     From March 2, 2013 to February 7, 2014, Ms. Jimenez lived at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, with her four year-old son, Amaurys.

196.     From March 2, 2013 until November 2013, Ms. Jimenez lived with her husband, Amaurys Mata, who was physically and verbally abusive towards her.

197.     On August 22, 2013, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez filed a domestic incident report with the New York Police Department (NYPD) after Mr. Mata grabbed her arms and pushed her onto the sofa, causing pain to both arms. She wrote a statement in Spanish on the domestic incident report and reported the incidents to a Spanish-speaking police officer.

198.     On or about November 29, 2013, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez filed a domestic incident report with the NYPD after Mr. Mata verbally and physically assaulted her. While intoxicated, Mr. Mata called Ms. Jimenez derogatory names, refused to let her leave the apartment, and took her cell phone when she attempted to call a cab. He then pushed her to the edge of the bed, forcefully grabbed her arm, kicked her thigh, and caused her to sustain bruising and be in substantial pain. When he grabbed her, his whole body weight was on top of her, causing her to suffer a miscarriage a few days later. She was seven weeks pregnant. He also cut the telephone cable wire so that she could not use the land line to call for help.

199.     Eventually, Ms. Jimenez was able to call 911 using someone else's cell phone. Two English-speaking officers arrived, one of whom spoke basic Spanish. She explained

33

to the officer who spoke basic Spanish what happened to her. She explained that Mr. Mata had grabbed her arms, kicked her leg, and put his whole body weight against her body. She explained that he had taken her cell phone and cut the telephone cable. She showed the officers her arms which were red and in pain. The officers spoke with Mr. Mata, who was intoxicated. During the conversation, Mr. Mata agreed that he would leave.

200.     As he was leaving, Ms. Jimenez asked the officer, in Spanish, "He's not going to be arrested?" The officer responded, "No, he's leaving." The officer then told her that she could go to Family Court to get an order of protection. Ms. Jimenez was surprised that Mr. Mata was not arrested for assaulting her. She wrote a statement in Spanish about what had happened to her and it was included in the Domestic Incident Report.

201.     Over the next week, and for several weeks afterwards until approximately January 27, 2014, Mr. Mata threatened to kill Ms. Jimenez by phone and by text message on multiple occasions. He called from numerous phone numbers but Ms. Jimenez always recognized his voice. On two occasions, Mr. Mata said, "Don't worry. I'm going to kill you."

202.     On or about December 2, 2013, Ms. Jimenez filed a Family Offense petition in Bronx Family Court, seeking an Order of Protection against Mr. Mata. Ms. Jimenez was granted a temporary order of protection and was advised to return to court on December 6, 2013.

203.     Sometime between November 29, 2013 and December 5, 2014, Ms. Jimenez suffered a miscarriage, and experienced severe physical and emotional pain.

204.     On December 5, 2014, Ms. Jimenez was released from Montefiore Medical Center. Her doctor advised her not to go to court because she was prescribed bed rest. On the following day, December 6, 2014, Ms. Jimenez was recovering from her miscarriage and could not attend the appearance. Her petition was dismissed without prejudice.

205.     On or about January 6, 2014, Ms. Jimenez filed a new Family Offense petition in Bronx Family Court and received a Temporary Order of Protection, valid until February 3, 2014. Mr. Mata's mother handed him a copy of the Temporary Order of Protection on or about January 15, 2014. The order of protection required Mr. Mata to stay away from Ms. Jimenez and their son, Amaurys, their home, and Amaurys's school. He was also ordered to refrain from communication or any other contact with them and to refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, or any criminal offense against them.

206.     On or about January 29, 2014, at approximately 5pm, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez returned home with her son, who was ill and had just been released from the emergency room, and discovered that the locks to her apartment had been changed without her knowledge or permission. She called 911 and spoke with a Spanish-speaking operator.

207.     About an hour later, two police officers arrived, neither of whom spoke Spanish. One of the officers was Officer Sweeting.  With the help of a neighbor present in the building lobby, Ms. Jimenez explained, with the neighbor acting as an interpreter, that she had an order of protection from Bronx Family Court and that her husband had changed the locks of her apartment without her knowledge and in violation of the order of protection. With her neighbor's interpretation, she also explained that Mr. Mata had been making death threats against her.

208.     It appeared that no one was present in her apartment. Ms. Jimenez filed another domestic incident report, and wrote a statement in Spanish. The officers wrote that Mr.

Mata was charged with the crimes of Aggravated Harassment and Unlawful Eviction on the Domestic Incident Report, and noted that Mr. Mata had made death threats against Ms. Jimenez. The officers told Ms. Jimenez that they did not have authorization to open the door and that she could go get a locksmith. They told Ms. Jimenez they could not do anything more. They told her that if her husband were present then they would arrest him but that since he wasn't there, they couldn't do anything.

209.    Unable to get into her apartment, Ms. Jimenez had no clothes or food or milk for her son. She had to borrow clothes from a friend for herself and her son.

210.    On or about January 30, 2014, at approximately 6pm, at 3540 Decatur Avenue, Apt. 2D, Bronx, NY 10467, Ms. Jimenez returned home with her four year old son, who was still ill and had spent a second day in the emergency room due to a persistent fever. When she arrived, she discovered that the locks to her apartment were still changed and she and her son were unable to enter. She planned to call a locksmith but then she heard her husband inside the apartment. She called 911 and spoke with a Spanish-speaking operator. She advised the operator that she had a valid order of protection and that she believed Mr. Mata was in her apartment and that he had changed the locks. She explained to the 911 operator that she needed a Spanish-speaking police officer.

211.    Ms. Jimenez waited with her son for the police to arrive. She waited for over an hour and a half. She called two times, explaining that she needed an officer to arrive while her husband was present. She also explained the situation to her neighbor who lived in her building and who is a police officer in Long Island. Her neighbor, Jie, called 911 on her behalf two times while they waited.

212.    Finally, two English-speaking officers arrived who did not speak Spanish. Ms.

36

Jimenez asked them for a Spanish interpreter. They ignored her request. She said numerous times in Spanish, "I do not speak English", "Please" "I need someone to explain things to me." She then called her neighbor, Jie, on her phone and asked him to interpret for her, using the speaker phone option on her cell phone. With the assistance of Jie, Ms. Jimenez explained to the police officers who had arrived that she had a valid order of protection against Mr. Mata and that he had unlawfully changed the locks to her apartment. She showed the officers her copy of the order of protection and asked them to give a copy to Mr. Mata. The whole time that she was explaining what help she needed, one of the police officer was holding her cell phone in his hand, as Jie attempted to interpret on her behalf.

213.     As they went upstairs to the apartment, the officers told Ms. Jimenez that they did not want to continue to use the interpretation services of her neighbor, via cell phone, because they said he wasn't authorized. Ms. Jimenez declined to hang up the phone and continued to ask her neighbor to interpret for her.

214.     When the police officers arrived at her apartment and knocked on the door, Mr. Mata opened the door and was in the apartment with a woman and a man. Mr. Mata and his friends spoke English with the police officers. The police officers did not give the order of protection to Mr. Mata, even though one of them was holding the order of protection in his hand. They did not arrest Mr. Mata.

215.     While Ms. Jimenez waited outside of her apartment, the police officers, Mr. Mata, and Mr. Mata's friends began putting her belongings into trash bags. When she saw what they were doing, she tried to explain, with the help of Jie, that those were not the things that she needed and that she needed her son's clothing. The officers told Ms. Jimenez that she had five minutes to collect her personal belongings and to leave the apartment. After three minutes of

trying to collect her things, one of the police officers pushed Ms. Jimenez and told her that she had to leave.

216.     While the police officers, Mr. Mata, and his friends were putting her personal items into trash bags, the police officers laughed with Mr. Mata and mocked Ms. Jimenez for living in this country and not speaking English. One of the police officers said to Ms. Jimenez, "Your husband is having a party. You should stay quiet." Ms. Jimenez understands enough English to know what they were saying, even though she cannot speak English.

217.     Throughout this entire incident, Ms. Jimenez attempted to explain to the officers repeatedly and with the assistance of her neighbor, that she lived in the apartment with her son and that she had an order of protection against Mr. Mata. Unsuccessful in persuading the police officers, Ms. Jimenez had no choice but to leave the apartment with her sick son. She was not permitted to file a domestic incident report. That evening, the temperature dropped to 16 degrees Fahrenheit.[1]

218.     The police officers left the trash bags containing her personal items on the sidewalk in front of her building. When Ms. Jimenez's friend came out of his car to help her pick up the trash bags, the officers told him in English "You speak English? No? Move it, move it, move it." The officers motioned for her friend to move away. One of the officers then gave her the order of protection back.

219.     After taking her personal items to a friend's house, Ms. Jimenez went to the 52nd precinct to request assistance from a Spanish-speaking police officer. She spoke with Officer Vidal, who spoke to her in Spanish, and explained what had happened. Officer Vidal asked her if she saw the officers who had responded to the 911 call in the precinct. Ms. Jimenez

---

[1] http://www.accuweather.com/en/us/new-york-ny/10007/january-weather/349727.

said that she did not. Ms. Jimenez then waited until the officers arrived. When they walked into the precinct, Ms. Jimenez informed Officer Vidal that they had arrived. Officer Vidal asked the officers what had happened and they told him that they were not able to communicate with Ms. Jimenez because she speaks Spanish.

220.     Officer Vidal informed Ms. Jimenez that the officers had made a mistake and told her that they would correct the mistake. They told her not to worry. Two police cars then accompanied Ms. Jimenez back to her apartment. Of the four officers with Ms. Jimenez when they went back to her apartment, two spoke Spanish and two did not. One of the officers was Officer Vidal. When they entered the apartment, they arrested Mr. Mata. Ms. Jimenez was never permitted to file another domestic incident report.

221.     Ms. Jimenez lost over $9000 in cash and personal property while she was unlawfully evicted from her home. The next day, Ms. Jimenez's son's condition worsened and she was forced to take him back to the emergency room. He suffered from a persistent fever and a throat infection.

222.     Ms. Jimenez fears for her life and the life of her son, and believes that the police gave her husband numerous opportunities to kill her when they failed to arrest him in November and January. Had she not returned to the precinct and found a Spanish-speaking officer, Ms. Jimenez fears that her husband would never have been arrested and would have killed her. She fears that the police are unable and unwilling to protect her against her husband, and she believes that the police discriminated against her for not speaking English.

**Plaintiff Graciela Simbana**

223.     Graciela Simbana is a twenty-five year old woman from Ecuador who resides on Staten Island.  Ms. Simbana's primary language is Spanish, and her ability to speak and

39

understand English is very limited.

224.     Ms. Simbana had a full stay-away Temporary Order of Protection from

criminal court against Daniel Almazo that was issued on October 20, 2013.

225.     On April 14, 2014, Mr. Almazo physically attacked Ms. Simbana at her home

on Staten Island.

226.     Ms. Simbana called 911 and spoke to an operator in Spanish.  The operator

told Ms. Simbana that the NYPD would send a Spanish-speaking officer to the scene.

227.     When the responding officers arrived, neither of them were Spanish-speaking.

228.     The officers communicated only with Mr. Almazo in English, and ignored

Ms. Simbana's injuries and her attempts to communicate.

229.     Ms. Simbana's friend then asked an English-speaking relative of the landlord

to help interpret for Ms. Simbana.

230.     Only with the help of the landlord's relative, Mr. Almazo was persuaded to

surrender his keys to the apartment and to leave the scene, and the police were persuaded to fill

out a DIR.

231.     However, even though Ms. Simbana had visible injuries from the attack and

showed the officers the full stay-away Temporary Order of Protection, the officers failed to

make the mandatory arrest of Mr. Almazo.

232.     The NYPD made no attempt to arrange for appropriate interpretation for Ms.

Simbana in light of the domestic violence situation.  Moreover, aside from the violations of

NYPD language access policy, in this incident the officers once again violated the NYPD's most

basic policies and procedures regarding domestic violence incidents and enforcement of orders

of protection.

**Plaintiff Oumou Sylla**

233.     Ms. Oumou Sylla is a thirty-four year old French-speaking woman from Guinea who resides in the Bronx.  Ms. Sylla's ability to speak and understand English is very limited.

234.     On May 21, 2014, Ms. Sylla's husband, Moussa Kalissa, called 911 and falsely alleged that Ms. Sylla was attacking him.  Ms. Sylla then called 911 herself and spoke to an operator in broken English.

235.     When officers arrived from the 40th Precinct, they spoke only to Ms. Sylla's husband in English, but made no attempt to arrange for interpretation for Ms. Sylla despite her obvious inability to communicate in English.

236.     Based solely on Mr. Kalissa's allegations, the officers arrested Ms. Sylla and separated her from her 9-month-old daughter.

237.     Ms. Sylla was never given a chance to make a statement to the police.

238.      When Ms. Sylla arrived at the 40th Precinct, no one spoke to Ms. Sylla in French or asked her if she needed an interpreter.  Ms. Sylla was not afforded the opportunity to file a domestic incident report against her husband, and spent the evening in the precinct jail.

239.      Ms. Sylla was not reunited with her daughter until May 30th, after her attorneys filed emergency papers in Family Court.


**Ms. Soledad Julia Hilares Huarca de Ruiz**

240.     Ms. Soledad Julia Hilares Huarca de Ruiz is a limited English proficient woman who lives on Staten Island.  Her primary language is Spanish.

241.     Ms. Huarca de Ruiz recently moved to the U.S. with her 8 year-old daughter

to join her husband on Staten Island.  Her husband is mentally ill and disabled. He is dependent on his parents.

242.     Ms. Huarca de Ruiz has been abused verbally and psychologically by her mother-in-law since arriving in this country.  She is scared that her mother-in-law is going to physically hurt her.  Ms. Huarca de Ruiz experiences daily harassment by her mother-in-law.

243.     On September 5, 2014, her mother-in-law was especially abusive towards her. She felt that the verbal abuse was going to escalate into physical violence. She felt unsafe so she called 911.

244.     The police officers who arrived at her home, located at 200 Targee Street on Staten Island, did not speak Spanish. Ms. Huarca de Ruiz believes they were from the 120 precinct. They did not attempt to utilize any interpretation services.

245.      The police officers were met by the Ms. Huarca de Ruiz's mother-in-law and other family members who speak English.  Her brother-in-law told the officers that Ms. Huarca de Ruiz was being insulting and tried to hurt them physically.  Ms. Huarca de Ruiz did not understand most of the conversation but understood when the officers told her to "go away".

246.     Ms. Huarca de Ruiz was very scared and said that she knew that her inability to speak English was causing a communication problem with the police.  They did not allow her to file a report but her brother-in-law was able to file a report against her.

247.     On September 8, 2014, Ms. Huarca de Ruiz went to the 120 precinct with a paralegal from Staten Island Legal Services in order to file a report.  They waited about 1.5 hours and were repeatedly told that they had to wait for an officer who could operate language line.  At one point, an officer approached the paralegal and asked her some questions about the client.  The paralegal repeatedly stated that the officer should speak to the client with an

42

interpreter.

248.     On September 9th, Ms. Huarca de Ruiz and her social worker returned to the precinct in an attempt to file a report.  They were asked numerous times what they needed and each time they stated that they needed a Spanish interpreter to make a report.

249.     A person working at the front desk asked a member of the public to interpret for Ms. Huarca de Ruiz.   Ms. Huarca de Ruiz could not understand this person and did not understand what the NYPD employee was attempting to communicate.

250.     The paralegal repeatedly requested an interpreter and reiterated that Ms. Huarca de Ruiz wanted to file a DIR.   The NYPD employee at the front desk then told the paralegal that someone from the DV unit would take her report using the language line.

251.     When the DV officer arrived, approximately 30 minutes later, he asked the paralegal to explain Ms. Huarca de Ruiz's issue.  The paralegal directed him to speak with Ms. Huarca de Ruiz directly.

252.     The officer, badge # 5669, then communicated with client using Language Line. Officer Chi then approached Ms. Huarca de Ruiz and the paralegal, and told them in English that her husband and brother-in-law were at the precinct yesterday asking about her and her daughter. Officer Chi, who was one of the officers who arrived at Ms. Huarca de Ruiz's home on 9/5/14, asked the paralegal where Ms. Huarca de Ruiz was staying and why she was afraid of her husband.

253.     The paralegal told officer Chi that it would be better to speak to Ms. Huarca de Ruiz directly.  Officer Noto, from the DV unit, then told Ms. Huarca de Ruiz to go to Family Court to petition for an Order of Protection.  Officer Noto initially refused to file a DIR for Ms. Huarca de Ruiz, but after the paralegal intervened, he agreed to do so.  Ms. Huarca de Ruiz and

her paralegal were in the precinct for 2.5 hours before she was able to file a DIR.

### Mr. Bhishma Yogi

254.     On August 8, 2014, Mr. Bhishma Yogi, a limited English proficient Nepali-speaking man who was an employee of a pool hall in Queens was arrested during a raid because of suspected gambling.

255.     He was approached by the police officers and tried to tell them he was just an employee, but mistakenly said "employer".

256.     One police officer asked him if he spoke Korean and he told them he spoke Nepali. He tried to talk more but they kept telling him to "shut up".

257.     Mr. Yogi was handcuffed and arrested. He was taken in a van for a while and then to the 115th precinct. He was arrested around 4pm on a Friday and was not released until about 9pm Saturday.

258.     After others arrested at the same time had already been released, Mr. Yogi finally asked a police officer what was happening as best as he could in English. They told him they did not have a Nepali interpreter available so they had to wait.

259.     No one ever spoke to him or used an interpreter while he was in police custody for approximately 29 hours.  Mr. Yogi did not know what he was being charged with. While riding in the van he asked if he could use a bathroom many times and the officers refused. Mr. Yogi was forced to pee on himself in the van. He also has diabetes and was not given food that he could eat.

**Ms. Pema Sherpa**

260.     Ms. Pema Sherpa, a limited English proficient Nepali-speaker, is a victim of domestic violence.  Ms. Sherpa's husband would punch her, hit her, scratch her and otherwise abuse her.

261.     On June 24, 2013 her husband attacked her.  In her defense, she pushed him away and his glasses cut his face. He called the police but Ms. Sherpa did not know that at the time.

262.     Later that night, Ms. Sherpa was asleep in her home next to her children.  The next thing she knew, police officers were in her home and arrested her.  She did not know what was happening and no one gave her any explanation that she could understand.  She was handcuffed in front of her children.  She was not provided with interpretation and was never offered the opportunity to make a statement herself.

263.     Ms. Sherpa was taken to the 108th precinct in Queens.  The police did not offer her an interpreter or ask her if she would like to make a statement at any time.  Ms. Sherpa spent the night in jail and was allowed to leave the next day.  Ms. Sherpa was scared and did not know what was happening.

264.     Upon discharge, a police officer wrote a note in English for her that reads, "call 911 tell them: I have an OP and I need a police escort to remove things from my home. I spoke to Officer Maria at 108 precinct."

265.     Ms. Sherpa continues to be threatened by her husband and has lost all faith in the police to help her.

**Ms. Xiao Fan Li**

266.     Ms Xiao Fan Li is a limited English proficient Mandarin speaker.  Ms. Li lives in Brooklyn.   On January 19, 2013, Ms. Li's husband shoved her against a dresser and she fell to the floor.  Later that same day, he kicked her to the floor.  That's when Ms. Li called 911 and spoke to a Mandarin-speaking operator.

267.     She told the operator that her husband was beating her and she needed assistance.  When officers arrived at her home, none of them spoke Mandarin or offered to provide her with an interpreter.

268.     The officers were speaking with her husband in English within hearing distance.

269.     The officers asked her if she wanted her husband to be arrested.  She didn't know what "arrested" meant.  No arrest was made.  If Ms. Li had known what "arrested" meant, she would have wanted him arrested.

270.     The officers asked Ms. Li if she needed medical assistance.  Her back hurt and she'd had surgery on it before, and she was sick, so she said yes.  An ambulance transported Ms. Li to Lutheran Medical Center.

271.     Ms. Li wanted legal protection but did not believe she needed mental health treatment.  Ms. Li was admitted to the medical center but did not know that she would not be allowed to leave without the doctor's permission.  Ms. Li was admitted from 1/20/13 -1/22/13.

272.     On January 22, 2013, after she was discharged from the hospital, Ms. Li went to the 62nd precinct in order to file a report and press charges.   The precinct did offer her an interpreter, but the interpreter spoke Cantonese, not Mandarin, and Ms. Li could not understand him.  Ms. Li spoke to a female officer, then she was escorted home.

46

273.     The next day, police officers came to Ms. Li's home to get more information and to take photos.  Again, they did not speak Mandarin nor did they offer her interpreter services.

**Plaintiff Violence Intervention Program**

274.     The Violence Intervention Program, Inc. ("VIP") is a nationally recognized non-profit organization that aims to remedy and to prevent violence against women.  VIP delivers a full range of services including on-site counseling, residential accommodations and child care. VIP has offices in Manhattan, the Bronx and Queens.

275.     VIP serves approximately 1,400 women per year and annually receives approximately 12,000 hotline calls.  The majority of VIP's clients are Spanish-speaking women with limited English proficiency.

276.     VIP counselors and advocates regularly interact with LEP domestic violence victims who report experiencing language barriers when attempted to communicate with the NYPD both at the station houses and in the field with officers who respond to 911 calls.

277.     VIP clients are regularly told by the NYPD that there is no one who can communicate with them in Spanish and that they must speak English.

278.     English speaking police officers often communicate only with their English-speaking abusers of VIP clients and do not speak directly with the LEP victim at all.

279.     As a result, many VIP clients, in addition to experiencing fear, frustration and humiliation, are denied vital assistance and are prevented from filing police reports and making statements.

280.     As a result of NYPD's failure to provide language access services, VIP counselors and advocates are regularly compelled to spend portions of their work day assisting

LEP clients in communicating with the NYPD.  VIP staff members frequently call precincts and/or other NYPD locations to complain about lack of interpreter services, interpret over the phone with the NYPD when the NYPD fails to provide interpreters for their clients, and accompany LEP clients to precincts in order to interpret for them.

281.    The NYPD's failure to provide interpretation for LEP individuals imposes a significant and ongoing burden on VIP staff members as they attempt to assist their clients.  The constant need to assist LEP clients in communication with the NYPD means that counselors are often unavailable to provide the numerous other services that VIP offers.

<u>CLAIMS FOR RELIEF</u>

<u>FIRST CAUSE OF ACTION:</u>
<u>INTENTIONAL DISCRIMINATION UNDER TITLE VI OF THE</u>
<u>CIVIL RIGHTS ACT OF 1964, 42 U.S.C § 2000(d), *et seq.*</u>

282.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

283.    The NYPD is a municipal agency in receipt of funding from the federal government.

284.    Discrimination based on race and national origin, is prohibited by recipients of federal financial assistance under 42 U.S.C. § 2000(d), *et seq.*

285.    Defendants, through their policy, custom or practice, intentionally discriminated against Plaintiffs based on their national origins and limited English proficient status in violation of Title VI of the Civil Rights Act and its implementing regulations.

286.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries and damages and have been deprived of their rights under the civil rights laws.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF THE SAFE STREETS ACT, 42 U.S.C. § 3789d**

287.        Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

288.        The Safe Streets Act, 42 U.S.C. § 3789d, and its implementing regulations prohibit discrimination, *inter alia*, on the basis of national origin by programs funded in whole or in part from funds made available under 42 U.S.C. § 3789d(c)(4).  The regulations were promulgated by the United States Department of Justice and codified at 28 C.F.R. § 42.203.

289.        The NYPD receives federal funding that subjects it to the requirements of the Safe Streets Act.

290.        Defendants, through their policy, custom or practice, intentionally discriminated against Plaintiffs based on their national origins and limited English proficient status in violation of the Safe Streets Act and its implementing regulations.

291.        As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and have been deprived of their rights under the Safe Streets Act and its implementing regulations.


**THIRD CAUSE OF ACTION: DISCRIMINATION**
**UNDER THE EQUAL PROTECTION CLAUSE OF THE U.S CONSTITUTION**

292.        Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

293.        Defendants denied Plaintiffs equal access to the services and protections of the NYPD based on their national origins.  Such discrimination violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

294.     Defendants acted under color of state law to deprive the Plaintiffs of their Fourteenth Amendment rights.  A cause of action is created by 42 U.S.C. § 1983.

295.     As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages.

## FOURTH CAUSE OF ACTION: DISCRIMINATION UNDER THE EQUAL PROTECTION CLAUSE OF THE NEW YORK STATE CONSTITUTION

296.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein

297.     Defendants denied Plaintiffs equal access to the services and protections of the NYPD based on their national origins.  Such discrimination violates the Equal Protection Clause of the New York State Constitution.

298.     As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages.

## FIFTH CAUSE OF ACTION: DEPRIVATION OF RIGHT TO PETITION GOVERNMENT FOR REDRESS OF GRIEVANCES UNDER U.S CONSTITUTION

299.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

300.     Defendants, through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from filing complaints and reports and otherwise communicating with police officers from whom they sought assistance.

301.     Defendants acted under color of state law to deprive Plaintiffs of their First

Amendment right to petition the government for the redress of grievances.  A cause of action is created by 42 U.S.C. § 1983.

302.     As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages.


**SIXTH CAUSE OF ACTION:**
**DEPRIVATION OF RIGHT TO PETITION THE GOVERNMENT**
**UNDER ARTICLE I, §9 OF THE NEW YORK STATE CONSTITUTION**

303.      Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

304.     Defendants, through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from filing complaints and reports and otherwise communicating with police officers from whom they sought assistance.

305.     Defendants thereby deprived Plaintiffs of their right under the New York State Constitution to petition the government.

306.     As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages.


**SEVENTH CAUSE OF ACTION:**
**INTENTIONAL DISCRIMINATION BASED ON NATIONAL ORIGIN UNDER NEW**
**YORK CITY'S HUMAN RIGHTS LAW**

307.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

308.     Defendant NYPD is a public accommodation under the NYC Human Rights Law.

51

309.     Defendants' custom and practice of refusing to offer and provide interpretation services to limited English proficient Plaintiffs and others seeking to access NYPD services intentionally discriminates against Plaintiffs and other persons of foreign national origin by denying them access to the services and protections of the NYPD in violation of the New York City Human Rights Law.

310.     Defendants' degrading and dehumanizing treatment of Plaintiffs constitutes intentional discrimination based on their national origin and deprives them of their rights under the New York City Human Rights Law.

311.     Plaintiffs are entitled to injunctive relief and damages in an amount to be determined by the court.

### EIGHTH CAUSE OF ACTION:
### DISPARATE IMPACT DISCRIMINATION BASED ON NATIONAL ORIGIN
### UNDER NEW YORK CITY'S HUMAN RIGHTS LAW

312.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

313.     Defendant NYPD is a public accommodation under the NYCHRL.

314.     Defendants' custom and practice of refusing to offer and provide interpretation services to limited English proficient Plaintiffs and others seeking to access NYPD services disparately impacts Plaintiffs and other persons of foreign national origin by denying them access to the services and protections of the NYPD offered to English speakers, in violation of the New York City Human Rights Law.

315.     Plaintiffs are entitled to injunctive relief and damages in an amount to be determined by the court.

## NINTH CAUSE OF ACTION:
## INDIVIDUAL CLAIMS OF PLAINTIFF MACARENO PURSUANT TO 42 U.S.C. § 1983
## AGAINST OFFICER TRADOLSE AND JOHN DOES 1-3

316.     Plaintiff ARLET MACARENO repeats and re-alleges the foregoing paragraphs related to her arrest and ongoing contact with the NYPD as if the same were fully set forth herein.

317.     Defendants wrongfully and illegally arrested and detained Plaintiff Macareno.

318.     The wrongful, unjustifiable, and unlawful apprehension, arrest and detention of Plaintiff Macareno was carried out without any basis, without Plaintiff's consent, and without probable cause or reasonable suspicion.  In fact, Ms. Macareno, who is a victim of extreme and repeated domestic violence, attempted to communicate with and repeatedly asked for an interpreter to communicate with Defendants and was repeatedly denied, as alleged herein. Defendants, without hearing her story, arrested her without cause.

319.     By using excessive force against Ms. Macareno and by failing to provide her with necessary medical treatment, Defendants deprived her of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. A cause of action is created by 42 U.S.C. § 1983.

320.     Officer Tradolse and John Does 1-3 acted, or failed to act, or to intervene, under color of state law and in their individual and official capacities and/or within the scope of their respective employments as NYPD officers.  Said acts or failures to act or intervene by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff Macareno of her constitutional rights.

321.     As a direct and proximate result of the misconduct detailed above, Plaintiff Macareno suffered injuries and damages alleged herein.

## TENTH CAUSE OF ACTION:
## INDIVIDUAL CLAIMS OF PLAINTIFF MACARENO UNDER STATE LAW AGAINST OFFICER TRADOLSE AND JOHN/JANE DOES 1-3

322.     Plaintiff ARLET MACARENO repeats and re-alleges the foregoing paragraphs related to her arrest and ongoing contact with the NYPD as if the same were fully set forth herein.

323.     By reason of the foregoing, and by wrongfully and illegally arresting, detaining and imprisoning Ms. Macareno, the Individual Defendants, under pretense and color of state law and acting within the scope of their employment as NYPD officers, falsely arrested and falsely imprisoned Ms. Macareno.  At all relevant times, the Individual Defendants acted forcibly in apprehending and arresting Ms. Macareno.

324.     The Individual Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Ms. Macareno's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward Ms. Macareno.

*325.*     Defendant City of New York, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior.*

326.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages herein before alleged.

**ELEVENTH CAUSE OF ACTION:**
**INDIVIDUAL CLAIMS OF PLAINTIFF PADILLA TORRES PURSUANT TO 42 U.S.C.**
**§ 1983 AGAINST OFFICERS JOHN/JANE DOES 4-6**

327.     Plaintiff YANAHIT PADILLA TORRES repeats and re-alleges the foregoing paragraphs related to her arrest and ongoing contact with the NYPD as if the same were fully set forth herein.

328.     Defendants wrongfully and illegally arrested and detained Plaintiff Padilla Torres.

329.     The wrongful, unjustifiable, and unlawful apprehension, arrest and detention of Plaintiff Padilla Torres was carried out without any basis, without Plaintiff's consent, and without probable cause or reasonable suspicion.  In fact, Ms. Padilla Torres, who is a victim of domestic violence, attempted to communicate with and repeatedly asked for an interpreter to communicate with Defendants and was repeatedly denied, as alleged herein.  Defendants, without hearing her story, arrested her without cause.

330.     By arresting and prosecuting Ms. Torres, Defendants deprived her of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.   A cause of action is created by 42 U.S.C. § 1983.

331.     John/Jane Does 4-6 acted, or failed to act, or to intervene, under color of state law and in their individual and official capacities and/or within the scope of their respective employments as NYPD officers.  Said acts or failures to act or intervene by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff Torres of

her constitutional rights.

332.     As a direct and proximate result of the misconduct detailed above, Plaintiff

Padilla Torres suffered injuries and damages alleged herein.

## TWELFTH CAUSE OF ACTION:
## INDIVIDUAL CLAIMS OF PLAINTIFF PADILLA TORRES UNDER STATE LAW
## AGAINST OFFICERS JOHN/JANE DOES 4-6 AND CITY OF NEW YORK

333.     Plaintiff YANAHIT PADILLA TORRES repeats and re-alleges the foregoing

paragraphs related to her arrest and ongoing contact with the NYPD as if the same were fully set

forth herein.

334.     By reason of the foregoing, and by wrongfully and illegally arresting,

detaining and imprisoning Ms. Padilla Torres, the Individual Defendants, under pretense and

color of state law and acting within the scope of their employment as NYPD officers, falsely

arrested and falsely imprisoned Ms. Padilla Torres.  At all relevant times, the Individual

Defendants acted forcibly in apprehending and arresting Ms. Padilla Torres.

335.     The Individual Defendants acted with a knowing, willful, wanton, grossly

reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Ms. Padilla Torres'

rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct

toward Ms. Padilla Torres.

*336.*     Defendant City of New York, as employer of the Individual Defendants, is

responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat*

*superior.*

337.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, plaintiff sustained the damages herein before alleged.

**THIRTEENTH CAUSE OF ACTION:**
**INDIVIDUAL CLAIMS OF PLAINTIFF JIMENEZ UNDER STATE**
**LAW AGAINST OFFICER SWEETING AND JOHN/JANE DOES 19-**
**20 AND CITY OF NEW YORK**

338.     Plaintiff ELENA JIMENEZ repeats and re-alleges the foregoing paragraphs related to her interaction with the NYPD as if the same were fully set forth herein.

339.     By reason of the foregoing, the Individual Defendants, under pretense and color of state law and acting within the scope of their employment as NYPD officers, the Individual Defendants acted forcibly in their interactions with Ms. Padilla Torres.

340.     The Individual Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Ms. Padilla Torres' rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward Ms. Padilla Torres.

*341.*     Defendant City of New York, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior.*

342.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages herein before alleged.

**FOURTEENTH CAUSE OF ACTION:**
**INDIVIDUAL CLAIMS OF PLAINTIFF SHERPA UNDER STATE**
**LAW AGAINST OFFICERS JOHN/JANE DOES 21-22 AND CITY OF**
**NEW YORK**

343.     Plaintiff PEMA SHERPA repeats and re-alleges the foregoing paragraphs related to her arrest and ongoing contact with the NYPD as if the same were fully set forth herein.

344.     By reason of the foregoing, and by wrongfully and illegally arresting, detaining and imprisoning Ms. Pema Sherpa, the Individual Defendants, under pretense and color of state law and acting within the scope of their employment as NYPD officers, falsely arrested and falsely imprisoned Ms. Pema Sherpa.  At all relevant times, the Individual Defendants acted forcibly in apprehending and arresting Ms. Pema Sherpa.

345.     The Individual Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Ms. Pema Sherpa's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward Ms. Pema Sherpa.

*346.*     Defendant City of New York, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior.*

347.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages herein before alleged.

**FIFTEENTH CAUSE OF ACTION:**
**INDIVIDUAL CLAIMS OF PLAINTIFF YOGI UNDER STATE LAW**
**AGAINST JOHN/JANE DOES 23-24 AND CITY OF NEW YORK**

348.     Plaintiff BHISHMA YOGI  repeats and re-alleges the foregoing paragraphs related to his arrest and ongoing contact with the NYPD as if the same were fully set forth herein.

349.     By reason of the foregoing, and by wrongfully and illegally arresting, detaining and imprisoning Mr. Bhishma Yogi, the Individual Defendants, under pretense and color of state law and acting within the scope of their employment as NYPD officers, falsely arrested and falsely imprisoned Mr. Bhishma Yogi.  At all relevant times, the Individual

Defendants acted forcibly in apprehending and arresting Mr. Bhishma Yogi.

350.    The Individual Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Mr. Bhishma Yogi's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward Mr. Bhishma Yogi.

*351.*    Defendant City of New York, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior.*

352.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages herein before alleged.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Declare that Defendants' actions violated the Plaintiffs' rights under the U.S. Constitution, the New York Constitution, Title VI of the Civil Rights Act of 1964, the Safe Streets Act, the laws of New York State, and New York City Human Rights Law;

2.    Enjoin further violations of the Plaintiffs' rights by issuing an injunction requiring the NYPD to:

a.    Abide by laws and policies requiring the provision of interpreter services;

b.    Refrain from unlawful treatment of LEP and foreign-born individuals;

   c.  Institute and implement  policies and programs with respect to the provision of interpreter services and treatment of foreign-born and LEP communities that comply with all legal requirements;

   d.  Establish a system for tracking and monitoring NYPD practices regarding the use of interpreter services;

   e.  Institute measures to ensure compliance with NYPD policies regarding language services, including ongoing documentation of the provision of interpreter services.

   f.  Develop and implement appropriate training for members of the NYPD regarding treatment of LEP and foreign-born communities including when to provide an interpreter, how to properly work with interpreters, sensitivity training and cultural competence;

   g.  Develop appropriate supervisory procedures regarding the treatment of foreign-born and LEP communities and the provision of interpreter services to LEP individuals;

   h.  Implement a system of reporting to the Plaintiffs and the Court regarding the steps taken to cure the violations of the Plaintiffs' and other LEP individuals'rights;

   3.  Issue a judgment against the City of New York in an amount to be determined by the Court, including compensatory damages for injuries sustained by  Plaintiffs in amounts that are fair, just, and reasonable;

   4.  Award Plaintiffs damages against Officer Tradolse, Officer Furda and John Does 1-24 to the extent that their liability is based upon actions that were reckless, willful, wanton, and malicious undertaken in their individual capacities, in an amount which is fair, just, and reasonably designed to punish and deter said conduct;

   5.  Order Defendants to pay reasonable costs and attorneys' fees to the Plaintiffs;

   6.  Grant any other relief the Court deems just and proper.

Dated: October 7, 2014
       New York, N.Y.

                        AMY TAYLOR, ESQ.
                        NANCY GOLDHILL, ESQ.
                        EDWARD JOSEPHSON, ESQ.
                        CHRISTOPHER LAMB, ESQ.
                        STEPHANIE TAYLOR, ESQ.
                        LEGAL SERVICES NYC
                        40 Worth Street, 6th Floor
                        New York, NY 10013
                        (646) 442-3600

                        EMERY CELLI BRINCKERHOFF
                          & ABADY LLP
                        MATTHEW D. BRINCKERHOFF, ESQ.
                        75 Rockefeller Plaza, 20th Floor
                        New York, N.Y. 10019
                        (212) 763-5000 (t)
                        (212) 763-5001 (f)
                        ATTORNEYS FOR PLAINTIFFS